UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KW TEXTILE INC. and BARAK ULIN, | |
| Plaintiffs, | **COMPLAINT** |
| -against- | |
| DLP FUNDING LLC d/b/a DIRECT LENDING PARTNERS FUNDING, LEVY COHEN, JARED DAVIS, MENUCHA MAYBERG, and JOHN DOE AGENTS OF THE COMPANY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## <u>INTRODUCTION</u>

1.      In the backdrop of this case is the business of "merchant cash advance"—or, "MCA."  The basic mechanics of the MCA industry are as follows.  MCA companies give money to businesses in need of cash, and in return they expect repayments that typically exceed the limits of criminal usury.  These deals purport to avoid usury-rules by claiming to not be loans but, instead, the purchase of future revenue streams.  By way of example, an MCA funder could provide $100,000 to a merchant along a schedule that would see $150,000 in repayments within one year, and frequently within six months.   But instead of demanding these payments along a steady schedule, the MCA company would demand a fixed percentage (the "specified rate" or "purchased percent") of the merchant's (pre-expense) revenues, such that the payment schedule would leave open the possibility that repayment could take longer or shorter than the timeframe originally contemplated by the underlying agreement.

2.      When done properly, MCA funding falls outside the rules of usury because the funder allows payment obligations to rise and fall according to the counterparty's revenue.  In many cases, however, this allowance is illusory.  In those instances, the MCA company sets up obstacles to the counterparty's ability to adjust—or "reconcile"—their repayment obligations to

their revenues, and upon deviations to that schedule the MCA company becomes highly litigious. Due to the razor edge with usury, the MCA industry has thus received heavy attention from law enforcement. *See, e.g.,* New York State Attorney General, *Attorney General James Sues Large Predatory Lending Operation Targeting Small Businesses* (Mar. 5, 2024).[1] And litigation, often in federal court, revolves around distinguishing legitimate financial transactions from RICO violations. *See, e.g., Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp.3d 237 (S.D.N.Y. 2022).

3.      The present case involves a New York company and its agents on the wrong side of this divide—who attempt to escape the local laws of usury while knowing that their conduct is usurious and against the law. They attempt to avoid New York usury rules by claiming that their funding agreements are mere cash-advances against future receivables, not loans, which the actual circumstances of the transactions prove to be a charade—corroborated by the very name in which the Defendants have chosen to conduct business: Direct *Lending* Partners.

4.      Instead, the Defendants engage in an illegal enterprise designed around making and collecting on usurious loans while deceiving their customer base—whom they breed to breach so that they can convert each "MCA" into a hard money obligation, as corroborated by the hundreds of litigations the Defendants have filed in the State of New York in the last several years. Through this action, the Plaintiff-Company and its owner respectfully requests the Court's assistance in bringing this illegal conduct to an end and imposing the damages that state and federal law allow.

---

[1] Available at: https://ag.ny.gov/press-release/2024/attorney-general-james-sues-large-scale-predatory-lending-operation-targeting. Notably, companies by the name of "Samson" are expressly mentioned multiple times by the Attorney General's Office in this suit. https://ag.ny.gov/sites/default/files/2024-03/nyag-v-yellowstone-et-al.pdf

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. §1331, as the claims in this action include causes of action arising under federal law—including 18 U.S.C. §1964(c), for civil claims arising under the Racketeer Influenced Corrupt Organizations statute.

6.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over state law causes of action arising from the same set of transactions or occurrences as the federal claims.

7.      Venue is proper in the Southern District of New York under, *inter alia*, 28 U.S.C. § 1391(b), as New York, New York and/or Sullivan County, New York are the nerve-centers of the defendant entity and, on information and belief, all defendants are residents of the State of New York; and as a substantial portion of the events forming the basis of the claim occurred in the State of New York.

8.      A jury trial is hereby demanded.

## PARTIES

9.      Plaintiff KW Textile Inc. (the "Company") is a corporation with a principal place of business in the State of New York.

10.     Plaintiff Barak Ullin is a resident of the State of New York and is the Chief Executive Officer of the Company.

11.     Defendant DLP Funding LLP d/b/a Direct Lending Partners ("DLP Funding") is a domestic limited liability partnership organized under the laws of the State of New York.

12.     Defendant Levy Cohen is, on information and belief, the owner and/or manager of DLP Funding.

13.     Defendant Menucha Mayberg is, on information and belief, an executive at DLP Funding.

14.     Defendant Jared Davis is, on information and belief, an executive at DLP Funding.

15.     Defendant John Doe Agents are the agents of the DLP Funding entity.

## BACKGROUND

16.     The principal nature of the DLP Funding enterprise and its agents results in predatory lending in violation of New York's usury laws, which the Defendants, acting in concert and in association with each other, attempt to skirt with false claims of making mere cash-advances.

17.     The Plaintiff-Company is one victim in what is believed to be a long line of victims of this conduct, as, on information and belief, the launchpad for the usurious conduct—the loan transaction documents—are identical here as when the Defendants have used them with scores of other victims, from whom the Defendants have unscrupulously recouped funds far beyond the limits of criminal usury.

18.     The transaction document here is the "Merchant and Security Agreement dated January 13, 2025" (the "Contract").   This deal charged a 48% premium on "funding" the Defendants expected to recoup in full in less than half of a year—leaving effective interest rates that skyrocket past the laws of usury.

19.     The Defendants purport to escape the reach of New York's usury laws by labeling the Contracts mere merchant cash-advances rather than loans, but, as set forth below, this is a pretext to obfuscate the racketeering activities in issue—conduct that is rendered only more crystal

clear by the Defendants' pairing of usurious loan-conduct with the type of freewheeling threats that motivated the passage of the RICO framework in the first place.[2]

20.    New York's usury statute attaches to loans with annualized interest rates of 25% (*see* Penal Law §190.40)—which the Contract here plainly exceeds.

21.    One consequence of this reality is that the loan, upon a finding of usury, is no longer collectible. *See, e.g., Szerdahelyi v. Harris*, 67 N.Y.2d 42, 48 (1986) ("when a court deems a transaction to be usurious, it must … enjoin prosecution on [it]…."); Gen. Ob. §5-511(2)).[3] The other consequence is that the Contract can become an "unlawful debt" predicate for civil RICO liability. *See, e.g., Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp.3d 237 (S.D.N.Y. 2022) (providing comprehensive analysis of class action claims against "merchant cash advance" funder).[4]

22.    The economic reality of the Contract here shows that the Contract is a loan.

23.    First, while the weekly payment obligations are subject to the Company's  request for "reconciliation" against future drops (or gains) in revenue, this purported "reconciliation" provision of the Contract is for appearances only; in reality, as the Defendants knew at all times, it left the Defendant-funders with substantial discretion to block any reconciliation requests that the Plaintiff-Company could ever lodge.

---

[2] *See, e.g., United States v. Private Sanitation Industry Ass'n of Nassau/Suffolk Inc.*, 793 F. Supp. 1114, 1156 (E.D.N.Y. 1992) ("RICO was designed to prohibit the activities of the Mafia").

[3] These consequences of usury are surely "harsh"—"relie[f] of all further payment"—but this reflects "the view of our Legislature that the prescribed consequences are necessary to deter the evils of usury." *Seidel v. 18 E. 17th St. Owners, Inc.*, 79 N.Y.2d 735, 740 (1992).

[4] Authorizing "threefold … damages," "the cost of the suit," and a "reasonable attorney's fee." *See* 18 U.S.C. §1964(c).

24.     More particularly, reconciliation under the Contract is contingent on the Company not being in default.  *See* Exhibit A (Contract) at ¶1.4.  Yet when the Defendants signed up the Company for funding, they had the Company agree to provisions that would render the Company in default automatically—hollowing out the basis for reconciliation from day one.

25.     For instance, the Contract buried a provision in the deal stating for the benefit of DLP Funding that the Plaintiff-Company had no "encumbrances of any kind or nature whatsoever"—despite the fact that they knew of prior cash advance deals and encumbrances before the Contract.  This landmine converted the Company's alleged "Reconciliation" rights into a purely discretionary matter for the Defendants, for they baked an event of default into the contract before it even began.

26.     Second, while facially there is no "finite" term of the Contract, the reality is that by baking an Event of Default into the agreement, the Defendants have enabled themselves to demand full repayment at their discretion.  *See* Exhibit A at 1 (purporting to allow DLP Funding to ramp up entitlement to "100%" of the Company's receivables).  What is more, they have secured this entitlement with access not just to future income streams but with the Company's hard assets, like equipment, instruments and inventory—collectible directly against the Company rather than any account debtors (*see id.* at 8), precisely the type of rights that highlight the economic realities of a loan rather than a purchase of receivables.  *See, e.g., Fleetwood Servs. LLC v. Ram Capital Funding LLC*, 2022 WL 1997207, at *10 (S.D.N.Y. 2022).

27.     Thus, the Contracts do indeed impose a finite term:  simply stated, it is as "finite" as the Defendants want them to be.

28.     Third**,** the Contracts force the Plaintiff-Company to commit to having no anticipation of bankruptcy, and, worse, secure the funding with not just future receivables but the

threat by the Defendants to seize the Company's hard assets — meaning that, in essence, a breach of the agreement would allow the Defendants to close the Company's business for good. This is clearly designed to scare the Company away from contemplating bankruptcy, even if such a declaration were appropriate.

29.    Overall, these are deals that significantly exceed the usury limits that prevail under New York law. And the Defendants' conduct surrounding the transactions corroborates their knowledge of the underhanded nature of the deals.

30.    For example, on April 7, 2025, without Plaintiff having defaulted on the payment schedule arising under the Contract, but in an increasingly difficult financial circumstance, counsel contacted the Defendants in pursuit of an amicable resolution. A person identifying himself as "Menucha M." responded with a counter and the threat to "freeze [the Company's] AR"—referring to its accounts receivables. A person identifying himself as Jared Davis then chimed in, stating that Defendants would "get ou[r] payback through the legal system, we have been doing this for years."

31.    In the weeks that followed, the individual defendants, acting in concert, escalated the amount of money it was drawing from the Company—drawing twice per week instead of once—and began reporting to the Company's owner, Mr. Ullin, that "your lawyer is a dumb fuck starts to bitch about our contract…." Jared Davis then defended the double-pull of money on the purported basis that the Company had engaged in "stacking"—an industry term used to describe a merchant that participates in a subsequent cash advance while still making payment on an existing cash advance—notwithstanding the fact that at all relevant times the Defendants knew that their own Contract was an act of stacking on top of other merchant cash advance positions.

32.    The aggressive tactics used as against the Company extend far beyond the Company, and have led to a widespread list of other companies for whom DLP Funding has imposed its predatory terms, knowing they would lead to default and removal of reconciliation rights, and dragged into litigation in lieu of using the reconciliation process—leading to more than one hundred cases filed by DLP Funding in the New York State Court system since 2021 alone. Within this group of cases, some of DLP Funding's victims have begun standing up in court to identify the harrowing experience of doing business with DLP Funding, including *inter alia*, the following matters:

    a.  *DLP Funding LLC v. Allegiant Healthcare West LLC et al*., Index 140637/2024 – Counterclaims against DLP Funding LLC for fraud, deceptive business practices, and other claims, alleging repeated requests for reconciliation that were refused, the improper withdrawal of $100,000, with "mafia-like collection efforts" and acts of "calling or texting plaintiff with vile and abhorrent threats";

    b.  *DLP Funding LLC v. J&S Enterprise and Transport LLC et al.*, Index 503156/2023 – Counterclaims against DLP Funding LLC for "loan related funding" that was "non-compliant, illicit, unlawful, untrue, and false pursuant to federal and state banking, lending, and business regulation laws," citing "predatory," "manipulative," and "exorbitant interest rate payments";

    c.  *DLP Funding LLC v. Pat Gibbs Landscape Design & Construction Inc. et al.*, Index 503794/2025 – Counterclaims against DLP Funding LLC alleging improper refusals to reconcile merchant cash advance agreement notwithstanding contract provisions allowing for reconciliation;

d.  *DLP Funding LLC v. GH Home Building LLC et al.*, Index 504790/2023 – Counterclaims against DLP Funding LLC alleging usury and fraud;

e.  *DLP Funding LLC v. Cheval-Vapeur Transportation LLC et al.*, Index 506626/2023 – Counterclaims against DLP Funding LLC alleging usury and fraud;

f.  *DLP Funding LLC v. Paul Owen Kyle DBA K C Custom Concepts, et al.*, Index 508091/2023 – Counterclaims against DLP Funding LLC alleging illegal collection practices and exorbitant interest rates, seeking damages for *inter alia* fraud;

g.  *DLP Funding LLC v. Foreclosure Excess Proceeds LLC et al.*, Index 511088/024 – Counterclaims against DLP Funding LLC alleging improper refusal to engage in reconciliation process under the contract; and

h.  *DLP Funding LLC v. Chameleon LLC et al.*, Index 521927/2024 – Counterclaim against DLP Funding LLC alleging "real interest rates in the triple and even quadruple digits," refusals to reconcile, and "a climate of intimidation and fear."

33.  Having issued illegal loans through deceptive and predatory practices, the Defendants should now be liable for the claims implicated by their conduct, as set forth below.

## CAUSES OF ACTION

### FIRST:  CIVIL LIABILITY UNDER THE RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT ("RICO")

34.  Plaintiffs repeat all prior allegations as if set forth more fully herein.

35.  DLP Funding is an "enterprise" under 18 U.S.C. §1961, and the remaining defendants (the "Individual Defendants") are RICO "persons" conducting or otherwise participating in the affairs of DLP Funding through a pattern of racketeering activities as set forth herein—including Defendant Cohen who on information and belief manages and organizes

the enterprise's affairs, Jared Davis and Menucha Mayberg who participate in the enterprise's affairs by generating prospects of desperate businesses and leading them into predatory lending arrangements that breach the rules of usury, and, on information and belief, others whose names are not yet known.

36.    The Individual Defendants are engaged in the knowing issuance of illegal loans in order to accomplish their aims of collecting on unlawful debts—including the Contract.

37.    The Individual Defendants work in concert with each other, and under the auspices of DLP Funding, to increase the amount of money ultimately owed by the Plaintiff-Company and to set the Plaintiff-Company up to be in automatic default under the Contract.

38.    The Defendants' conduct formed a pattern of racketeering activity, including but not limited to the issuance and collections under the Contract and dozens if not hundreds of other contracts that mirror its terms over several years, publicly available on NYSCEF; as well as the threats to freeze assets and file suits as against merchants, including the Company, notwithstanding the fact that it was not in breach of any payment provision; and the ramping up of payment draws for the very type of alleged contract breach that DLP Funding itself creates by virtue of knowingly stacking on top of other funding positions to render the merchant in default under other agreements. The effectuation of usurious loans has on information and belief, been the hallmark of the Defendants' businesses since opening in or about January of 2021—using the same language in the same contracts to hide the usurious nature of the transactions under the guise of being mere merchant cash advance deals.

39.    The issuance of usurious loans is proscribed under, and a predicate for civil liability under, the RICO framework relating to the collection of illegal debts. *See* 18 U.S.C. §1961(6); 18 U.S.C. §1962(c).

40.    To date, the Plaintiffs have paid the Defendants a total of $279,500 on the illegal Contract.

41.    The Defendants are liable under the civil RICO framework for treble damages for monies paid by the Plaintiff Company; as a consequence of its usurious nature the Contract is uncollectible; and the Defendants should be liable for costs, attorney fees, and punitive damages.

## SECOND: CONSPIRACY TO COMMIT RICO

42.    Plaintiffs repeat all prior allegations as if set forth more fully herein.

43.    The Defendants entered into an agreement to administer illegal loans in violation of New York law and the RICO framework and have acted on that agreement throughout the course of the allegations in this case and, on information and belief, since the inception of the Defendant entity in 2021.

44.    The Defendants have acted on that agreement in this case, targeting the Plaintiff-Company through the Contract.

45.    The Defendants are liable under the civil RICO framework for treble damages for monies paid by the Plaintiff Company; as a consequence of its usurious nature the Contract is uncollectible; and the Defendants should be liable for costs, attorney fees, and punitive damages.

## THIRD: DECEPTIVE BUSINESS PRACTICES (GEN. BUS. LAW 349)

46.    Plaintiffs repeat all prior allegations as if set forth more fully herein.

47.    The Defendants are consumer-oriented businesses, holding themselves out as lending or funding companies for the benefit of merchant-consumers in need of liquidity.

48.    In holding themselves out as ordinary lenders or funders, the Defendants' conduct is materially misleading—failing to identify that the financial transactions in issue are usurious; deceiving consumers into thinking the New York laws or usury do not apply; and burying

provisions into the funding contracts, as here, that render the consumers in automatic default and thus stripping the consumers of the right to "reconciliation" under the contracts.

49.     The Plaintiffs have been injured as a result of the Defendants' deceptive conduct, having signed up for the predatory loans in issue and having already tendered payment significantly in excess of the funds received.

50.     Plaintiffs are entitled to compensatory damages for all out-of-pocket losses sustained; attorney fees; and punitive damages.

**FOURTH: UNJUST ENRICHMENT**

51.     Plaintiffs repeat all prior allegations as if set forth more fully herein.

52.     The Defendants have been enriched through the use of their usurious loan contracts.

53.     The Defendants' enrichment has been at the Plaintiffs' expense.

54.     It is against equity and good conscience to permit the Defendants to retain such enrichment in violation of New York's usury rules.

**WHEREFORE**, Plaintiffs pray for relief as follows:

A.     That the Court award compensatory and treble damages to Plaintiffs and against the defendants jointly and severally, in an amount to be determined at trial;

B.     That the Court award punitive damages to Plaintiffs, and against all defendants, in an amount to be determined at trial that will deter such conduct by defendants in the future;

C.     That the Court award attorney's fees, costs and disbursements;

D.     For a trial by jury;

E.     For a pre-judgment and post-judgment interest and recovery of their costs; and

F.     For any and all other relief to which they may be entitled.

Dated: Garden City, New York
        May 19, 2025

                                        **BARKET EPSTEIN KEARON**
                                        **ALDEA & LOTURCO, LLP**

                            By:     /s/ *Alexander Klein*_____
                                        Alexander Klein, Esq.
                                        666 Old Country Road, Suite 700
                                        Garden City, New York 11530
                                        aklein@barketepstein.com